[Cite as *In re S.G.*, 2013-Ohio-3317.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | CASE NO. CA2013-03-009 |
| S.G. | : | O P I N I O N<br>7/29/2013 |
|  | : |  |
|  | : |  |
|  | : |  |

APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20103121

Kathy Szelagiewicz, 1170 Frazier Road, Midland, Ohio 45148, Guardian Ad Litem

Holly Simpson, 6284 Taylor Pike, Blanchester, Ohio 45107, for appellant

Richard W. Moyer, 103 East Main Street, Wilmington, Ohio 45177, for appellee

William C. Randolph, 1025 S. South Street, Suite 400, Wilmington, Ohio 45177, for appellee

Lauren Raizk, 145 N. South Street, Wilmington, Ohio 45177, for Stephen Goins

**S. POWELL, P.J.**

{¶ 1}   Appellant, biological mother of S.G., appeals a decision of the Clinton County Court of Common Pleas, Juvenile Division, granting permanent custody of S.G. to Clinton County Children Services ("CCCS").  For the reasons outlined below, we affirm.

{¶ 2}   On October 25, 2010, CCCS filed a complaint alleging that S.G. was an

abused, neglected, and dependent child. In the complaint, CCCS alleged that when S.G. was sick at school, school personnel attempted to call appellant to pick up S.G. Appellant allegedly hung up on school personnel on several occasions. Eventually, school personnel reached appellant. Appellant allegedly later arrived at school via taxi after stopping at a convenience store to purchase two bottles of liquor. Appellant admitted to drinking.

{¶ 3} An initial hearing was held on November 16, 2010 where CCCS was granted protective supervision on an interim basis. A pretrial hearing was scheduled for December 15, 2010. Appellant was ordered not to have any unsupervised contact with S.G. At the pretrial hearing, the juvenile court found that it was in the best interest of S.G. to be in the custody of CCCS, and S.G. was removed from placement with her maternal grandmother ("grandmother").

{¶ 4} At the adjudication hearing on January 3, 2011, appellant admitted to S.G. being a dependent child. All other allegations regarding S.G. were dismissed. Appellant was ordered not to have any unsupervised contact with S.G., and the matter was set for disposition on January 18, 2011.

{¶ 5} At disposition, the juvenile court heard testimony and received evidence over a period of two days. The court ordered temporary custody of S.G. to CCCS, granted grandmother liberal visitation, and gave CCCS discretion over placement of S.G. Additionally, the court ordered a case plan to be adopted by CCCS that required appellant to complete parenting classes and demonstrate her understanding of parenting skills, learn to budget her finances in order to maintain a safe and clean environment, complete a drug and alcohol assessment and follow through with recommendations, and maintain consistent visits with S.G. The case plan also required S.G. to obtain a mental health assessment. On October 31, 2011, the juvenile court ordered that the case plan be amended to include a requirement that appellant complete a mental health assessment and follow through with

recommendations.

{¶ 6} Following several review hearings maintaining temporary custody of S.G. with CCCS, CCCS filed a motion to modify temporary custody to permanent custody on October 3, 2012. A hearing was held on the motion on February 11, 2013. An ongoing protective caseworker for CCCS, appellant, and a professional counselor who provides therapy to S.G. testified. S.G.'s guardian ad litem also briefly testified and filed a written report.

{¶ 7} The caseworker testified as to S.G.'s placement history and relationship with appellant, grandmother, father, and foster family. The caseworker testified that S.G. has been in the custody of CCCS since December 15, 2010. Prior to being placed in a foster home, S.G. lived temporarily with grandmother. After living with a foster family for approximately three months, S.G. was removed from this foster placement following hospitalization for exhibiting aggressive behavior, destroying property, and threatening to kill her foster parents. While waiting for a new foster family to complete foster training, S.G. lived with a second foster family for a period of approximately three months before moving to her current foster home. After moving to her current foster home in June 2011, S.G. sexually acted out, was aggressive, destroyed property, and urinated on the floor. As a result, she was placed in a treatment center for approximately six months. At this time, S.G. was only six years old. In September 2012, S.G. returned to the same foster home in which she was placed prior to treatment.

{¶ 8} The caseworker also testified as to S.G.'s relationships with her parents, her grandmother, and foster family. Regarding S.G.'s relationship with appellant, the caseworker testified that appellant struggled interacting with S.G. During supervised visits, appellant would often color by herself while S.G. played with other children. Additionally, the caseworker testified that S.G. stated appellant had "humped" and hurt her. The caseworker testified that S.G. also stated that she would not be sad if appellant died and that she wanted

to take a knife to appellant's throat. As a result, CCCS decided that it was detrimental for appellant to have contact with S.G. The caseworker testified that grandmother initially participated in counseling with S.G. at the treatment center. However, grandmother has not visited with S.G. since she left the treatment center. S.G.'s brother lives with grandmother and concerns were raised regarding the prudence of placing S.G. and her brother together as S.G. had stated that she would stick a needle into her brother's eye to his brain until he died. The caseworker testified that S.G.'s father never visited. While he had expressed interest, S.G.'s father failed to attend an initial appointment to evaluate whether visitation was appropriate. When S.G.'s father wanted to visit S.G. while she was in the treatment center, the caseworker testified that S.G. stated that her father had "humped" her and she wanted to kill herself by cutting her throat. As a result, S.G. was placed on suicide watch. Regarding S.G.'s relationship with her foster family, the caseworker testified that S.G. refers to them as "mommy" and "daddy" and interacts well with her foster parents. The caseworker testified that S.G's foster family is very supportive with S.G.'s treatment and had participated in intensive home-based therapy.

{¶ 9} Regarding appellant's case plan, the caseworker testified that she completed parenting classes but had trouble demonstrating what she had learned in visits with S.G. as she continued to struggle interacting with S.G. The caseworker testified that she could not adequately ascertain whether appellant learned to budget her finances because appellant's children were not living with appellant. The caseworker testified that appellant completed a drug and alcohol assessment and generally maintained consistent visits with S.G. until visits were discontinued by CCCS. However, the caseworker testified that appellant failed to complete a mental health assessment.

{¶ 10} Appellant also testified regarding her case plan. Appellant testified that she did not believe parenting classes were beneficial, but attempted to utilize disciplining techniques

and "when and then." When asked about the parenting classes she mentioned discipline and said "and well, I can't remember all of them." Regarding finances, appellant testified that money has never been a problem. Appellant receives back child support from her father that her mother gives to her. Appellant also receives Social Security Income. When appellant's children were living with her, she received additional benefits. Appellant testified that she completed the drug assessment and admitted missing at least one mental health appointment. Regarding visitation, appellant stated that she did not remember why she missed some visits prior to her visitation being suspended. Appellant at one point said that she was told she could send cards to S.G. and at another point appellant stated that she did not think she was allowed to send S.G. cards after her visitation was suspended. Appellant also testified that she did not believe it was in the best interest of S.G. to be adopted. Appellant believed she could take S.G. to mental health and that she would "get through" the situation. However, appellant testified that she did not know how S.G. would cope.

{¶ 11} S.G.'s therapist testified that S.G. identified appellant, her brother, and grandmother as responsible for sexually abusing S.G. However, S.G. later clarified that grandmother did not actually commit the sexual abuse, but was present when it occurred. The therapist testified that S.G. dislikes and distrusts her mother and brother. The therapist also testified that during sessions, S.G. lays dolls on top of one another and says that they are "humping." The therapist testified that there was no reason not to believe S.G. regarding sexual abuse with her exhibited symptoms. However, the therapist testified that she was not surprised to learn that appellant passed a polygraph examination regarding sexually abusing S.G. and does not believe S.G.'s brother perpetrated the sexual abuse.

{¶ 12} After hearing the above testimony, the juvenile court found by clear and convincing evidence that it was in S.G.'s best interest to permanently terminate parental rights and grant permanent custody of S.G. to CCCS. Appellant now appeals, and asserts

two assignments of error for review. Because they are related, we will address appellant's assignments of error together.

{¶ 13} Assignment of Error No. 1:

{¶ 14} THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO CLINTON COUNTY CHILDRENS' [sic] SERVICES WHEN BASED UPON THE EVIDENCE PRESENTED, IT WAS NOT IN THE CHILD'S BEST INTEREST.

{¶ 15} Assignment of Error No. 2:

{¶ 16} THE TRIAL COURT ERRED IN FINDING THAT A LEGALLY SECURE PLACEMENT COULD NOT BE ASSURED WITHOUT A GRANT OF PERMANENT CUSTODY TO CCCS.

{¶ 17} Mother argues that she substantially completed her case plan and remedied parenting concerns raised in the initial complaint. Consequently, Mother asserts that the trial court erred in finding she was unable to provide a legally secure placement and ultimately erred in awarding permanent custody of S.G. to CCCS because it was not in S.G.'s best interest. We disagree.

{¶ 18} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 748, 102 S.Ct. 1388 (1982). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re Starkey*, 150 Ohio App.3d 612, 2002-Ohio-6892, ¶ 16 (7th Dist.). A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *In re Rodgers*, 138 Ohio App.3d 510, 519-520 (12th Dist.2000).

{¶ 19} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test.  First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D).  "There is not one element that is given greater weight than the others pursuant to the statute."  *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.  Second, the court must find that any of the following apply: the child is abandoned; the child is orphaned; the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; or where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.  R.C. 2151.414(B)(1)(a), (b), (c) and (d); *In re E.B.*, 12th Dist. Warren Nos. CA2009-10-139, CA2009-11-146, 2010-Ohio-1122, ¶ 22.

{¶ 20} The juvenile court found by clear and convincing evidence, and appellant does not dispute, that S.G. is dependent and has been in the temporary custody of CCCS for more than 12 months of a consecutive 22-month period as of the date CCCS filed the permanent custody motion.  The juvenile court also found by clear and convincing evidence, and appellant does not dispute, that S.G. was abandoned by her father.  However, appellant's arguments relate to whether the juvenile court's finding granting permanent custody of S.G. to CCCS is in S.G.'s best interest.[1]

{¶ 21} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> the court shall consider all relevant factors, including, but not limited to the following:
>
> (a)  The interaction and interrelationship of the child with the

---

1. Whether a legally secure placement can be provided without granting permanent custody to a children services agency is a factor that must be considered in determining a child's best interest.

child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c)  The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;

(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 22}  With respect to R.C. 2151.414(D)(1)(a), the juvenile court found that S.G. has not had any relationship with her father since entering the custody of CCCS.  The juvenile court further found that appellant "does not interact or have an interrelationship with [S.G.]."  In making this determination, the juvenile court recognized that appellant attended 69 out of 86 scheduled visits prior to her visitation being suspended due to S.G.'s placement into a treatment center.  However, S.G.'s therapist described S.G.'s feelings towards appellant as "extremely angry and negative."  Furthermore, S.G. had indicated that she had been "humped" by appellant.  The juvenile court considered S.G.'s relationship with her foster parents.  The juvenile court found that S.G. has a loving relationship and good interaction with her foster parents, and S.G. refers to them as "mommy" and "daddy."  S.G.'s foster parents also participate in a parental role in S.G.'s therapy.  The juvenile court considered S.G.'s contact with grandmother and half-siblings.  S.G. had contact with grandmother until June or July 2012 after S.G. expressed violent thoughts towards her brother who lived with grandmother.  The juvenile court found that S.G. has several other half-siblings with whom she does not interact.

{¶ 23} With respect to R.C. 2151.414(D)(1)(b), the juvenile court indicated that S.G. is not of sufficient maturity to express her wishes as she is six years old and deals with significant mental health issues. The juvenile court did not interview S.G., but the guardian ad litem recommended that a grant of permanent custody to CCCS is in S.G.'s best interest.

{¶ 24} With respect to R.C. 2151.414(D)(1)(c), the juvenile court found that S.G. has been in the continuous temporary custody of CCCS since December 15, 2010. During this time, S.G. has been in three foster care placements. The first placement was from December 15, 2010 until March 2011, when S.G. was admitted to a children's hospital to stabilize behaviors. S.G. was then in an interim placement for a short period until her current placement. S.G. lived in her current foster home from June 2011 to April 4, 2012, and then was placed in a treatment center. After her six-month stint in a treatment center, S.G. returned to her current placement on September 13, 2012.

{¶ 25} With respect to R.C. 2151.414(D)(1)(d), the juvenile court found that a legally secure placement could not be provided for S.G. in the absence of a grant of permanent custody to CCCS. Testimony revealed that S.G. identified her father, mother, and brother as perpetrators of sexual abuse. S.G. also blamed grandmother for being present when sexual abuse occurred. Testimony indicated that S.G. wanted to kill appellant and her brother, and when her father was mentioned, S.G. indicated that she wanted to kill herself.

{¶ 26} With respect to R.C. 2151.414(D)(1)(e), the juvenile court found that R.C. 2151.414(E)(10) applied because S.G. was abandoned by her father.

{¶ 27} Furthermore, the juvenile court considered other relevant factors in determining S.G.'s best interest, including S.G.'s problematic behaviors and appellant's compliance with her case plan. S.G.'s therapist testified that S.G. presented anger, aggression, trauma avoidance seeking, and sexual acting out. The therapist confirmed S.G.'s diagnosis of posttraumatic stress disorder. The therapist also testified that S.G.'s dislike for appellant was

caused by what S.G. described as sexual abuse by appellant, including "humping" by appellant and oral sex between appellant and a male friend. The juvenile court also acknowledged that the therapist testified that therapy is about validating S.G., rather than the actual results of any polygraph test taken by appellant.

{¶ 28} In regard to her case plan, the juvenile court recognized that appellant completed the steps of maintaining stable housing and obtaining substance abuse treatment. The juvenile court also recognized that appellant receives Social Security Income. However, because children were not living with her, the court was unable to evaluate whether she had learned to budget her finances. The juvenile court recognized that appellant completed parenting classes. However, the juvenile court also recognized that CCCS possessed concerns as to whether appellant had demonstrated what she had learned in the classes. Additionally, appellant failed to obtain a mental health assessment. While appellant was ordered to maintain visitation with S.G., the juvenile court acknowledged that visitations were suspended and that the testimony was controverted and confusing as to what appellant understood about communicating with S.G. during the period of suspended visitation.

{¶ 29} After considering the above factors, the juvenile court found by clear and convincing evidence that it was in the best interest of S.G. to permanently terminate appellant's parental rights and grant permanent custody of S.G. to CCCS. The juvenile court's opinion demonstrates that it considered all relevant factors, including all factors under R.C. 2151.414(D)(1), S.G.'s behavior, and appellant's compliance with her case plan. While appellant asserts that greater weight should be given to appellant's compliance with her case plan, the juvenile court properly considered the appropriate factors and there is not sufficient conflict in the evidence presented to overturn its determination in weighing the evidence. Accordingly, we find sufficient credible evidence exists to support the juvenile court's grant of permanent custody to CCCS. Appellant's two assignments of error are overruled.

**{¶ 30}** Judgment affirmed.

PIPER and M. POWELL, JJ., concur.